**Karen MILLER, Plaintiff–Appellee,**

v.

**ALLDATA CORP.,**

and

**Robert Weiffenbach, Defendants–Appellants.**

No. 99–2035.

United States Court of Appeals, Sixth Circuit.

July 6, 2001.

Before MARTIN, Chief Judge; MOORE, Circuit Judge; and O'MALLEY, District Judge.*

O'MALLEY, District Judge.

Plaintiff Karen Miller sued her ex-employer, defendant Alldata Corporation, and her former supervisor, defendant Robert Weiffenbach, jointly and severally, for gender discrimination in violation of Michigan's Elliott–Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2501–2507. A jury found in Miller's favor and awarded her $16,000 in economic damages and $300,000 for emotional distress damages.

The defendants responded to the jury's verdict with motions seeking: (1) judgment (notwithstanding the verdict) as a matter of law; (2) new trial; and/or (3) remittitur. The district court denied all of

these motions, and also awarded Miller $177,628 in attorney's fees.

The defendants appeal each of these decisions. Finding no error, we AFFIRM.

## I.

This gender discrimination case presents the relatively unusual situation where the plaintiff admits her employer may have had a valid reason for terminating her, but asserts her employer's action was, instead, actually motivated by illegal discrimination. The jury found the plaintiff's assertion well-taken.

The following evidence was adduced at trial. Harry Evangelist, Ted Mannheimer, and plaintiff Karen Miller all worked similar jobs within the National Accounts Group at the Mitchell Corporation. In 1996, all three left Mitchell to work for defendant Alldata Corporation, a competitor to Mitchell Corporation and a subsidiary of AutoZone. Specifically, Robert Weiffenbach, Alldata's Vice President of Sales, hired Mannheimer away from Mitchell Corporation in May of 1996, to become Alldata's Director of Government and Fleet Sales, at an annual salary of $87,500. In June of 1996, Weiffenbach hired Evangelist away from Mitchell Corporation to become Alldata's Director of National Accounts, also at an annual salary of $87,500.

In July of 1996, Alldata's president, Rod Georgiou, suggested to Weiffenbach that he should also hire Miller, whom Georgiou knew from trade shows. In September of 1996, Weiffenbach hired Miller to manage Alldata's Value Added Reseller Accounts; she was given the title of Manager of Special Accounts and an annual salary of $62,500. While she worked at Alldata, Mil-

* The Honorable Kathleen O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

ler was the only female in the company's sales force. Evangelist, Mannheimer, and Miller all reported directly to Weiffenbach, and Alldata's Field Sales Organizational Chart showed the three as being at the same hierarchical level within the company.

Shortly after Alldata hired her, Miller attended an Alldata sales conference in Atlanta. Terry Buschbach, a sales representative who reported to Mannheimer, testified that, during this conference, Miller gave him a backrub on a walk back to the hotel from dinner. Buschbach felt the touching was "not appropriate" and told Miller so. At trial, Miller acknowledged touching Buschbach, but testified she "kind of ran up to him and put [her] arm either around his shoulders or on his shoulder to say something," and that it was not sexual in any way. Weiffenbach verbally reprimanded Miller for this episode while they were still in Atlanta.

A month later, in early October, Miller attended another Alldata sales conference in Sacramento, California. The night before the meeting was to begin, Miller met several other Alldata employees at a hotel lounge to have a drink. Sales representative Kerry Keller testified he was seated in the bar when Miller "c[ame] up and s[at] down beside the chair, thr[ew] her arm around me, ha[d] her leg draped across the top of mine and just start[ed] talking to the rest of the guys like nothing [was] going on." Keller stated he was "shocked" by Miller's conduct and felt it had sexual overtones. The next day, Keller observed Miller rubbing the shoulders of several male Alldata employees. Weiffenbach again spoke to Miller about inappropriate touching while in Sacramento.

Keller claims he decided to document his concerns about Miller's behavior shortly after this Sacramento meeting. Keller testified that he sent Weiffenbach an e-mail describing Miller's conduct and stat-

ing he believed Miller could become a liability to Alldata. Weiffenbach testified he did not receive this e-mail until mid-November. Neither Alldata nor Weiffenbach was able to produce Keller's original e-mail. The evidence was clear, however, that Weiffenbach asked Keller to send a re-creation of the message several months later, on March 14, 1997, the day after Miller's termination.

In November of 1996, Weiffenbach contacted Karlyn Oberg, Alldata's human resources director, for advice regarding Miller's conduct. Oberg concluded that Weiffenbach should "have a more emphatic conversation [with Miller] ..., document the conversation, and send her that documentation in writing so that it would be as formal as possible." Weiffenbach sent Miller a memorandum on November 19, 1996, directing her to "refrain[ ] from any physical contact other than a business acceptable handshake or similar activity." The memorandum further warned Miller that, in the event of similar complaints about her behavior, "further disciplinary actions will result, up to and including termination of employment from Alldata." Miller responded that she would follow Weiffenbach's directive.

Alldata held another sales conference in Sacramento in December of 1996. Despite having received Weiffenbach's warning, Miller hugged and rubbed the shoulders of other Alldata staff during training classes. In trial testimony, she conceded she might also have slapped an employee on the butt. One evening, after training classes, she put her hand on the leg of fellow salesperson Rene Young. Midway through the conference, several employees told Alldata national training manager Mark Gunnerson they felt "uncomfortable with regard to [Miller] touching them." Gunnerson relayed these comments to Weiffenbach, who told Gunnerson to take control of his class

and tell Miller to stop touching other staff inappropriately. Gunnerson believed that one employee in particular, Mike Smith, was especially unhappy with Miller's behavior. At trial, however, Smith denied being "truly upset" by Miller's having touched Young at the December meeting, and said Miller never touched him personally. Smith also testified he did not complain to anyone at Alldata about Miller's conduct, and that no one in his class believed Miller had sexually harassed anyone. Young testified he was "startled" when Miller touched his leg, but he did not consider it to be a sexual advance.

In a conversation with Weiffenbach roughly three weeks later, Weiffenbach claimed Gunnerson again expressed concern about Miller's conduct at the December training class. Weiffenbach said he explained that, if Gunnerson wanted him to address the complaints about Miller, Gunnerson would have to document them in writing. Gunnerson did not e-mail documentation of the December complaints until March 12, 1997, however, the day before Miller's termination. At trial, Weiffenbach could not explain why it took Gunnerson so long to send the documentation. Weiffenbach explained he had concluded the matter was inconsequential and "figured if it was serious the people would give [him] this thing in writing."

The sum of this evidence suggests Miller was excessively "touchy-feely," to the point that she made some of her colleagues uncomfortable, but that most of her colleagues did not actually believe she was sexually harassing them. As for Weiffenbach, the evidence suggests he knew of his staff's discomfort with Miller, but he believed the issue was not especially serious and that his senior managers could and would deal with it appropriately. The evidence also suggests Weiffenbach solicited documentation of complaints about Miller just before she was terminated.

In addition to the evidence showing Miller's co-employees were unhappy with her level of physical familiarity, evidence was also adduced showing Miller had reason to be unhappy with Weiffenbach's behavior. Miller testified that, almost immediately after her hire, Weiffenbach began criticizing and degrading her in front of Alldata customers. This included rolling his eyes and explaining to customers that Miller did not know what she was talking about. Weiffenbach answered phone calls from Miller rudely, while he was more pleasant to male employees; he subjected Miller's travel expense reports to criticism and scrutiny that he spared male sales representatives; and he demanded Miller submit her travel plans one month in advance, while not requiring the same from Evangelist and Mannheimer. More than once, Weiffenbach called Miller at home at 5:00 in the morning to discuss non-emergency business issues, although he did not bother his male employees at such odd hours. He once told Miller, "you're the reason I never re-married." Evangelist and Mannheimer confirmed that Weiffenbach frequently berated and reprimanded Miller for business conduct that they regularly followed themselves without repercussion, and that Weiffenbach required her to follow rules that he did not enforce against anyone else. Evangelist also testified that Weiffenbach referred to women in lewd and derogatory terms "almost every time [they] were together." The evidence was undisputed, moreover, that Miller, though working in the same capacity as Weiffenbach and Mannheimer, was paid substantially less.

After the December, 1996 sales meeting in Sacramento, no Alldata employee complained again about Miller's behavior. In early March of 1997, however, Weiffenbach informed Oberg he had received additional complaints about Miller's conduct. Oberg told him to investigate further and report

back. Weiffenbach then requested written statements from personnel who had previously indicated they had concerns about Miller. For example, in response to a request from Kerry Keller, Mike Smith e-mailed a memo regarding Miller on March 1, 1997. In this e-mail, Smith described Miller's conduct as "very unprofessional," and said that if other members in the December sales training class had acted that way, their jobs would be "toast." Smith testified he had not planned on writing this memo until Keller asked him to do so.

Shortly after Weiffenbach's discussion with Oberg, he reported to her that the information he had originally gathered had been supported by conversations with Keller and Gunnerson. After reviewing the "whole process," Oberg and Weiffenbach agreed they had "no choice but to terminate [Miller]." In a three-way telephone conversation on March 13, 1996, Oberg and Weiffenbach told Miller she was being fired for repeatedly and inappropriately touching other employees. Miller asked for a lesser punishment and promised to "sew [her] hands in [her] pockets," but Alldata did not relent.

After Miller left, Weiffenbach hired Ed Maron to fill a position similar to Miller's. Weiffenbach contends he called Maron only after Miller had been fired. But Maron testified he initiated a call to Weiffenbach in mid to late-March about possible employment at Alldata, and Weiffenbach had responded, "we're working on something and I'll get back to you shortly." Maron started work at an annual salary of $65,000, which was raised to $75,000 three months later.

After Alldata terminated her, Miller began working for her husband's company. Three months later, Miller obtained a na-

tional sales position with Anderson Corporation, at an annual salary of $62,500.

At the close of Miller's evidence, Alldata made a motion pursuant to Federal Rule of Civil Procedure 50(b) for judgment as a matter of law, which the district court denied. On June 16, 1999, the jury returned a verdict awarding Miller $316,000. Alldata renewed its motion for judgment as a matter of law and moved for a new trial and/or remittitur. The district court denied these motions and also awarded Miller $177,628.29 in attorney's fees, costs, and interest.

I. Alldata's Renewed Motion for Judgment as a Matter of Law.[2]

Alldata contends it is entitled to judgment as a matter of law on Miller's gender discrimination claim because she failed to demonstrate that the business reasons offered by Alldata for firing her were a mere pretext for gender discrimination. This renewed motion for judgment as a matter of law challenges the sufficiency of the evidence supporting the jury's verdict. In diversity cases, this Court applies a state-law standard of review to a Rule 50(b) motion for judgment as a matter of law based on a challenge to the sufficiency of the evidence. *Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500, 506 (6th Cir.1998) (citing *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir.1996)).

In *Matras v. Amoco Oil Co.*, 424 Mich. 675, 385 N.W.2d 586 (1986), the Michigan Supreme Court explained the applicable standard as follows:

In reviewing a trial court's failure to grant a defendant's motion for a directed verdict or judgment notwithstanding the verdict, we examine the testimony and all legitimate inferences that may be

---

**2.** Unless otherwise noted, "Alldata" refers hereinafter to both defendants.

drawn in the light most favorable to the plaintiff. If reasonable jurors could honestly have reached different conclusions, the motion should have been denied. If reasonable jurors could disagree, neither the trial court nor this Court has the authority to substitute its judgment for that of the jury.

*Id.* at 681–82, 385 N.W.2d at 588. A directed verdict is appropriate only when a case presents no factual dispute on which reasonable minds could differ. *Meagher v. Wayne State Univ.,* 222 Mich.App. 700, 708, 565 N.W.2d 401, 409 (1997), *appeal denied,* 457 Mich. 874, 586 N.W.2d 919 (1998).[3]

█ This Court applies state substantive law to the state law claims in a diversity action. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Because Miller brings her gender discrimination claim under Michigan's Elliott–Larsen Civil Rights Act, Michigan substantive law governs this action. Michigan courts, in turn, look to federal law when reviewing claims of employment discrimination filed under the Elliott–Larsen Act. *Lytle v. Malady,* 456 Mich. 1, 27, 566 N.W.2d 582, 595 (1997). Michigan has adopted the United States Supreme Court's burden-shifting analysis for employment discrimination claims. *Id.; Featherly v. Teledyne Industries, Inc.,* 194 Mich.App. 352, 362, 486 N.W.2d 361, 364 (1992).

### A. The Prima Facie Case

The Supreme Court first laid out its process for testing the sufficiency of an employment discrimination case in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and refined this process in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Initially, the plaintiff bears the burden of proving by a preponderance of the evidence a prima facie case of discrimination. To establish a prima facie case of gender discrimination under the *McDonnell Douglas* framework, a plaintiff must show that she: (1) is a member of a protected class; (2) was subjected to an adverse employment action; (3) was qualified for her position; and (4) was replaced by a person outside of the protected class. *Matras,* 424 Mich. at 683, 385 N.W.2d at 589.

As a woman, Miller is a member of a protected class. She was subjected to an adverse employment action when Alldata fired her on March 13, 1997. Evidence of her employment history with Mitchell Corporation suggests, and Alldata does not dispute, that she was qualified for her Alldata sales management position. And, Alldata replaced Miller with a man named Ed Maron shortly after her termination. It is clear, accordingly, that Miller did establish a prima facie case of gender discrimination.

### B. Defendant's Legitimate Reason for Plaintiff's Termination.

Once the plaintiff has made out a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. *Burdine,* 450 U.S. at 254. This is merely a burden of production; the ultimate burden of persuasion remains with the plaintiff. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

In this case, Alldata introduced evidence that Miller subjected male employees to unwanted touchings, and thus subjected Alldata to possible liability for tolerating sexual harassment at the company. Miller does not dispute that she engaged in un-

---

**3.** Michigan courts use the terms "directed verdict" and "judgment notwithstanding the verdict" rather than "judgment as a matter of law," the term used by Fed.R.Civ.P. 50.

welcome physical contact with her male co-employees, nor that Alldata reprimanded her for doing so. Although Miller testified she did not "feel there [was] anything wrong with [her behavior]," she essentially concedes Alldata had a nondiscriminatory reason for firing her. Alldata's gender-neutral explanation for its action "destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence." *Burdine,* 450 U.S. at 255 n. 10.

### C. Plaintiff's Rebuttal.

In the final step of the analysis, the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for intentional discrimination against the plaintiff. *Meagher,* 222 Mich.App. at 711, 565 N.W.2d at 410. The plaintiff may prevail if she can adduce evidence showing that: (1) the proffered reason had no basis in fact, or (2) the proffered reason did not actually motivate the employer's action, or (3) the proffered reason was insufficient to motivate discharge. *Id.* at 711–12, 565 N.W.2d at 411; *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir.1994). Miller relied at trial, and in her appellate briefs, primarily on the second prong. We conclude there was sufficient evidence from which a jury could reasonably conclude that, in fact, Alldata's stated reason for terminating Miller was not its actual reason, and that, instead, Alldata terminated Miller based on gender discrimination.

Under the second prong, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* have motivated dismissal. *Manzer,* 29 F.3d at 1084. The plaintiff then makes an indirect attack on the credibility of the employer's proffered explanation by showing circum-

stances which tend to prove that an illegal motivation was more likely. *Id.* That is, the plaintiff argues that the sheer weight of circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext. *Id.*

Miller presented at trial substantial circumstantial evidence that Alldata (and, particularly, Weiffenbach) was more likely motivated to terminate her by a discriminatory intent than by a desire to promote a harassment-free workplace. As noted, Miller, Evangelist, and Mannheim all testified consistently that, from the beginning of Miller's tenure with Alldata, Weiffenbach treated her differently than male employees. This different treatment included reprimands they did not receive for similar behavior, enforcement of rules against her and not them, and a heightened degree of scrutiny, criticism, and unsupportive attention applied to her but spared the male sales representatives. Further, although virtually every Alldata employee perceived Evangelist, Mannheimer, and Miller as occupying the same hierarchical level within the company (confirmed by Alldata's Field Sales Organizational Chart), Miller was paid $25,000 less per year than her two male colleagues. After Alldata hired Maron to fill a position similar to Miller's in March 1997, it quickly gave him a raise to pay him $12,500 more than she had been making. Put simply, there was a large body of evidence from which a jury could reasonably reach the conclusion that Weiffenbach singled out Miller for adverse treatment because of her gender.

In addition to this evidence of discrimination, Miller presented evidence that Weiffenbach misled human resources director Oberg as to the timing and validity of the complaints against Miller.[4] In early

---

4. There was no evidence that Oberg intentionally discriminated against Miller based on her gender.

March of 1997, Weiffenbach informed Oberg he had received additional complaints about Miller since he had spoken to Oberg about Miller in November of 1996. However, the events Weiffenbach used to corroborate the existence of these "new" complaints had all taken place several months earlier. Further, Weiffenbach solicited documentation of these earlier events from Alldata personnel who had theretofore decided not to complain in writing, and Weiffenbach then pointed to these documents as new evidence of Miller's inappropriate behavior—all at about the same time he learned that Maron, a male, was interested in working for Alldata and could replace Miller.

Alldata argues persuasively that it had *a* reason to terminate Miller. But Alldata does not persuade us that no reasonable jury could have found it more likely that Alldata's *actual* reason was gender discrimination. "If reasonable jurors could disagree, neither the trial court nor this Court has the authority to substitute its judgment for that of the jury." *Matras*, 424 Mich. at 682, 385 N.W.2d at 588. Examining all testimony and drawing all inferences in the light most favorable to Miller, a reasonable juror could have concluded that: (1) Miller's unwelcome touching of other employees *may* have given Alldata reason to terminate her; (2) despite this, Alldata did not do so; and (3) Alldata's motivation when it ultimately terminated Miller was not because she acted inappropriately but, instead, was a gender-discriminatory animus. Accordingly, the district court did not err when it denied Alldata's motion for judgment as a matter of law.

## II. Alldata's Motion for a New Trial.

In the alternative, Alldata argues it is entitled to a new trial, for a number of reasons. The denial of a motion for a new trial is reviewed under an abuse of discretion standard: "a definite and firm convic-tion [on the part of the reviewing court] that the court below committed a clear error of judgment." *Holmes v. City of Massillon*, 78 F.3d 1041, 1045–46 (6th Cir. 1996). We find that none of the recited bases for new trial leaves us with such a conviction.

Alldata first contends that the clear weight of the evidence necessarily leads to the conclusion that the jury made a mistake in rendering a verdict for Miller. In diversity cases, the district court applies federal law to determine whether the verdict was against the great weight of the evidence. *Morales*, 151 F.3d at 506. While this standard is lower than when evaluating the sufficiency of the evidence for judgment as a matter of law, *see* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2806 (2d ed. 1995), the standard is still rigorous, because in finding that a jury's verdict was against the weight of the evidence, the judge must, "to some extent at least, substitute[ ] his judgment of the facts and the credibility of the witnesses for that of the jury." *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir.1967). As noted above, the evidence Miller presented to show Alldata's discrimination against her was sufficient to support the jury's verdict; it was also sufficient, accordingly, for Miller to survive Alldata's motion for a new trial.

Alldata next argues the district court entered several erroneous evidentiary rulings that, singly or in combination, worked to its prejudice and denied it a fair trial. Specifically, Alldata points to the following rulings: (1) denial of Alldata's motion for leave to amend its answer; (2) grant of Miller's motions in limine; (3) denial of Alldata's motions in limine; and (4) refusal to give certain requested jury instructions.

With regard to Alldata's motion for leave to amend, Alldata contends that, af-

ter it fired Miller, she stole a company computer containing confidential information. Alldata contends the after-acquired evidence rule required the district court to grant the company leave to amend its answer to assert this defense. The after-acquired evidence rule, which this Court first applied in the employment discrimination context in *Johnson v. Honeywell Information Sys., Inc.*, 955 F.2d 409 (6th Cir.1992), holds that an employer can escape liability for its discriminatory actions if the company learns, after the fact, of an otherwise legitimate reason for having taken the adverse employment action.

In its order denying leave to amend, the district court concluded that the use of after-acquired evidence to limit a plaintiff's damages was appropriate only if "the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge" (quoting *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 363, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995)). Miller's alleged misconduct did not occur until after she was fired. Because Alldata could not have known about the allegedly stolen computer before it terminated Miller, the district court was correct in concluding that Alldata's motion for leave to amend was not well-taken.

With regard to evidentiary rulings, the district court granted two of Miller's motions in limine before the start of trial. The first ruling precluded Alldata from introducing evidence that Miller stole the computer; the second ruling prevented introduction of a memorandum written by her subsequent employer, Anderson Corporation, stating her job was in jeopardy due to poor performance. The first ruling was correct for the reason noted above regarding after-acquired evidence; the second was correct because the memorandum was hearsay and also because Alldata

had not produced it during discovery. The district court also denied two of Alldata's motions in limine—one seeking to exclude Evangelist's testimony that Weiffenbach was a "chauvinist," and another seeking to exclude Miller's testimony that Alldata and Weiffenbach "discriminated against" her. Alldata argues that "conclusory labels of discrimination do not show pretext and merely inflame or prejudice the jury." However, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704(a). Furthermore, Rule 701 states that a lay witness may offer opinion testimony if those opinions are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." Both this Court and Michigan courts have held it is not error to allow a lay witness to express an opinion regarding discrimination in an employment setting as long as the opinion complies with the requirements of Rule 701. *See Torres v. County of Oakland*, 758 F.2d 147, 149–50 (6th Cir.1985); *Wilson v. General Motors Corp.*, 183 Mich.App. 21, 35, 454 N.W.2d 405, 413 (1990). The district court was well within its discretion in refusing to exclude Evangelist's and Miller's testimony. In any event, we are certain that the district court's evidentiary rulings did not deprive Alldata of a fair trial.

Finally, Alldata contends the district court erred in refusing to give several proposed jury instructions. This Court reviews a district court's refusal to give requested jury instructions for an abuse of discretion. *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 449 (6th Cir.2000). Although trial courts have broad discretion in framing jury instructions, state law determines the substance of jury instructions in a diversity action, while federal proce-

dural law governs questions regarding the propriety of the instructions. *Id.*

Alldata asserts the district court committed error when it refused to: (1) instruct the jury as to the definition of an adverse employment action in Michigan; (2) give an instruction regarding "equal pay for equal work;" (3) give an instruction regarding what was required to show pretext; (4) read certain instructions addressing standards of sexual harassment; (5) read instructions regarding an employer's liability for tolerating sexual harassment under California law; (6) instruct the jury regarding Alldata's "honest belief" that Miller engaged in inappropriate conduct; and (7) instruct the jury regarding situations when "the hirer and firer are the same individual." Without addressing each of these claimed errors individually, it suffices to say that the instructions given by the district court, taken as a whole, accurately stated the law, and the district court did not abuse its discretion in refusing to give different or additional instructions. Our review of the charge conference reveals the district court was careful to ensure that the instructions it did give to the jury did not favor either side. Alldata's requested instructions were either superfluous in light of the Michigan Standard Jury Instructions given, irrelevant in light of the evidence, or simply an incorrect statement of the law.

In sum, we find that none of Alldata's asserted bases for grant of a new trial are well-taken, and the trial court did not abuse its discretion when it denied the motion.

### III. Alldata's Motion for Remittitur.

#### A. The $300,000 Emotional Distress Damage Award.

■ Alldata also appeals the district court's denial of its motion to remit the jury verdict. This Court reviews the denial of remittitur for an abuse of discretion.

*Slayton v. Ohio Dept. of Youth Servs.*, 206 F.3d 669, 679 (6th Cir.2000). A district court should reduce a jury's award of damages only when the judgment "clearly exceeds" the maximum damages a reasonable jury could find to compensate the plaintiff's loss. *Id.* Thus, we may reduce a jury award only if it is: (1) beyond the range supportable by proof; (2) so excessive as to shock the conscience; or (3) the result of a mistake. *Id.* Moreover, the excessiveness of a verdict is primarily a "matter ... for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses." *Id.* (citing *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 922 (8th Cir.1986)).

Under Michigan law, "[v]ictims of discrimination may recover for the humiliation, embarrassment, disappointment, and other forms of mental anguish which flow from the discrimination." *Howard v. Canteen Corp.*, 192 Mich.App. 427, 435, 481 N.W.2d 718, 723 (1991). Nonetheless, Alldata contends Miller presented no competent evidence from which a jury could infer that she suffered emotional distress as a result of her firing. Alldata asserts that "Miller called no witness to testify, and conceded that she received no medical treatment and had no documentation, to establish that she suffered emotional distress as a result of her termination." Michigan law, however, does not require that Miller present any of this particular evidence. For example, "medical testimony substantiating the claim is not required. When a verdict is within the range of evidence produced at trial it should not be reversed as excessive." *Id.* at 435–36, 481 N.W.2d at 723; *see Wilson*, 183 Mich.App. at 40, 454 N.W.2d at 415 (even though the plaintiff presented no "expert testimony regarding her mental distress but only testimony as to her own subjective feelings," the appellate court allowed the $375,000 award—remitted by the trial

court from $750,000—of non-economic damages to stand).

Miller did testify that she suffered emotional distress as a result of her treatment by Weiffenbach. She testified she began having sleepless nights, and sought medical treatment for stomach problems that developed during her employment with Alldata. Miller claimed her firing negatively affected her family life, that she was a "wreck," and that she "took it out on [her] boys and [her] grandchildren." She also described the difficulty of dealing with the loss of income and benefits from her position at Alldata.

In 1995, the Michigan Court of Appeals suggested that *any* competent evidence of emotional damages would be enough to sustain a jury verdict. "Because evidence of emotional damage was presented at trial, and the award was comparable to awards in similar cases, the trial court properly deferred to the jury and denied defendant's motions." *Paulitch v. Detroit Edison Co.*, 208 Mich.App. 656, 659, 528 N.W.2d 200, 203 (1995), *appeal denied*, 453 Mich. 970, 574 N.W.2d 28 (1996). The evidence in *Paulitch* primarily included the plaintiff's own testimony that his "relationships with his wife and friends suffered after he was passed over for [a] promotion" because of discrimination at the hands of his employer. *Id.* The jury awarded the plaintiff $359,000 in economic and emotional distress damages, which the appellate court upheld.

Put simply, the jury's emotional distress damage award in this case appears to be within the realm of other verdicts in comparable cases upheld by the Michigan appellate courts and this Court. *See, e.g., Lilley v. BTM Corp.*, 958 F.2d 746, 754 (6th Cir.1992), *cert denied*, 506 U.S. 940, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992) (upholding a verdict of $350,000 for emotional distress damages flowing from the employer-defendant's violation of the Elliott–Lar-sen Civil Rights Act). Accordingly, we conclude the district court did not abuse its discretion in denying Alldata's motion for remittitur of the emotional distress damage award.

## B. The $16,000 Economic Damage Award.

■ Alldata also challenges the jury's award of $16,000 to Miller for economic loss resulting from her termination. Miller testified at trial that, after she was fired by Alldata, she lost salary she would have earned, was unemployed for three months, and lost her subsequent job at Anderson Corporation due to her litigation against Alldata. An expert witness testified that, based on Miller's earnings history, the actuarial present value of her lost wages and benefits from Alldata was between $339,000 and $696,000. While the jury awarded Miller only $16,000 in economic damages, the district court appears to have been well within its discretion in denying remittitur of that amount.

## IV. Miller's Motion for Attorney's Fees, Costs, and Interest.

■ The district court granted Miller attorney's fees, costs, and interest in the amount of $177,628.29. This Court reviews a district court's award of attorney's fees and costs for an abuse of discretion. *Singleton v. Smith*, 241 F.3d 534, 538 (6th Cir.2001); *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 312 (6th Cir. 1997). An abuse of discretion exists when this Court is firmly convinced that a mistake has occurred or when the district court relied on clearly erroneous findings. *Harrison v. Metropolitan Govt. of Nashville and Davidson County, Tenn.*, 80 F.3d 1107, 1112–13 (6th Cir.1996), *cert. denied*, 519 U.S. 863, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996); *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir.1995).

In this diversity case, Michigan law governs whether an award of attorney's fees was appropriate. *Big Yank Corp.*, 125 F.3d at 312 n. 5. As a general rule, a federal court may not award attorney's fees to the prevailing party unless a statute or binding contract authorizes such a recovery. *Hall v. Cole*, 412 U.S. 1, 4–5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). The Elliott–Larsen Act does give the district court authority to award litigation costs and reasonable attorney's fees. Mich. Comp. Laws § 37.2802 (2000).

The "lodestar" figure of hours spent multiplied by the hourly rate is presumed to be the reasonable attorney's fee. *Schellenberg v. Rochester, Michigan Lodge No. 2225 of the Benevolent and Protective Order of Elks of the U.S.A.*, 228 Mich.App. 20, 53, 577 N.W.2d 163, 177 (1998). Further, the district court considers the following factors when calculating the reasonableness of attorney's fees: "(1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client." *Employees and Judge of the Second Judicial Dist. Ct., Second Div. v. Hillsdale County*, 423 Mich. 705, 750–51, 378 N.W.2d 744, 762 (1985).

Here, Miller's petition for an award of costs and fees included: (1) an itemized bill setting forth the date, description of work, and attorney and staff hours spent on this case; (2) the affidavits of Miller's attorneys setting forth their experience and qualifications, and attesting to the accuracy of their bill; (3) the Martindale–Hubbell listings for those attorneys; (4) excerpts from the Michigan Bar Journal's December 1997 Law Firm Economics Survey, which placed the rates charged by Miller's attorneys within the 75th to 95th percentile of rates charged by attorneys in the Detroit area; and (5) the client ledger card reflecting costs of this litigation.

In a post-trial hearing, the district court examined Miller's attorneys' documentation of their fees and addressed each of the *Hillsdale County* factors in turn. The court found that counsel's rates were reasonable and that Miller's case required extensive time and labor. The district court also referred to the paltry settlement offer made by the defendants. Given the defendants' settlement posture and the significant burden Miller bore in proving gender discrimination by Alldata, the district court found that Miller won a meaningful victory by proceeding to trial. The district court described the expenses incurred by counsel as "substantial" and found that Miller's two-year professional relationship with her attorneys was significant enough to merit the fees awarded to them.

We find that the district court did not abuse its discretion in awarding $177,628.29 in attorney's fees, costs, and interest to Miller.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denials of Alldata's motions for judgment as a matter of law, new trial, and remittitur, and we also AFFIRM the district court's award of $177,628.29 in attorney's fees, costs, and interest to Miller.